T.C. Memo. 1999-295


UNITED STATES TAX COURT


ESTATE OF WILLIAM T. ROGERS, DECEASED, GAYLE M. ROGERS, PERSONAL
REPRESENTATIVE, AND GAYLE M. ROGERS, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 23668-95.                    Filed September 3, 1999.


<u>William T. Ramsey</u>, for petitioners.

<u>Clinton M. Fried</u>, for respondent.

MEMORANDUM OPINION

WELLS, <u>Judge</u>:  Respondent determined a deficiency in petitioners'[1] 1991 Federal income tax in the amount of $3,506,517 and a section 6662 penalty of $701,303.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

---

[1]    The notice of deficiency in the instant case was sent to William T. Rogers and Gayle M. Rogers.  William T. Rogers died during 1998, after the briefs were submitted.  Accordingly, the caption of the instant case was amended to substitute for William T. Rogers the Estate of William T. Rogers, Gayle M. Rogers, Personal Representative.  For convenience, we hereinafter refer to petitioner Gayle M. Rogers as petitioner, William T. Rogers as Mr. Rogers, petitioner and Mr. Rogers as the Rogerses, and petitioner and the Estate of William T. Rogers, Gayle M. Rogers, Personal Representative, as petitioners.

The issues we must decide in the instant case are:[2]  (1) Whether Mr. Rogers received an interest in certain property during 1991 as compensation from Alpha Hospital Management, Inc. (Alpha Hospital), an S corporation in which Mr. Rogers was a shareholder; (2) the value, if any, of such interest; and (3) whether petitioners are liable for a penalty pursuant to section 6662(a) for substantial understatement of tax.

_____

[2]     Respondent's notice of deficiency determined a deficiency in the Rogerses' 1991 Federal income tax in the amount of $3,506,517 and a penalty pursuant to sec. 6662 in the amount of $701,303. In calculating the deficiency, respondent redetermined petitioner's income with respect to Alpha Medical, Inc. (Alpha Medical), a subchapter S corporation of which Mr. Rogers was the sole shareholder.  Respondent determined that $8,622,642 reported by both Alpha Medical and Mr. Rogers as compensation to Mr. Rogers was excessive.  Accordingly, respondent denied Alpha Medical's deduction for compensation to the extent of $8,122,015 and decreased Mr. Rogers' income from compensation to $500,627. Respondent further denied Alpha Medical deductions for other expenses in the amount of $1,507,344.  Accordingly, respondent increased Mr. Rogers' proportionate share of subchapter S income from Alpha Medical from a loss in the amount of $363,243 to income in the amount of $9,266,116.  Respondent has conceded by stipulation that Mr. Rogers' distributive share of income from Alpha Medical is in fact a loss in the amount of $363,243.
     Respondent also determined in the notice of deficiency that Mr. Rogers was not entitled to report under the installment method $9,804,000 from the sale of contract rights regarding certain property.  See infra note 5.  Subsequently, respondent amended the answer in the instant case to allege that, during 1991, Mr. Rogers received a compensatory interest in certain properties as payment for his services in arranging a transaction between American Medical Holdings, Inc. and Vista Hospital Systems, Inc.  By stipulation, respondent conceded the adjustment in the notice of deficiency in the amount of $9,804,000 with respect to the installment sale.  Respondent's position is that the value of the compensatory interest received by Mr. Rogers during 1991 was $10,320,000.

Background

The instant case was submitted fully stipulated. The parties' stipulations of fact are incorporated into this Opinion by reference and, accordingly, are found as facts in the instant case.

The record in the instant case is voluminous, consisting of numerous stipulated documents. The stipulated facts do not sufficiently explain the documents and the transactions described in the documents. Consequently, the record in the instant case is confusing and incomplete. Nonetheless, we have done the best we can to set forth below our findings of the facts of the instant case.

At the time they filed the petition in the instant case, the Rogerses resided in McDonald, Tennessee. Mr. Rogers was one of two shareholders of Alpha Hospital, an S corporation. The other shareholder was Health Facilities Management Group, a trust controlled by F. Scott Gross.

On May 15, 1990, Alpha Hospital entered into two asset purchase agreements. One asset purchase agreement was with American Medical Holdings, Inc. (AMH), a Delaware corporation and its wholly owned subsidiary New H Circle City, Inc. (Circle City), a California corporation. The other asset purchase agreement was with AMH and its other wholly owned subsidiary, New H Arroyo Grande, Inc. (Arroyo Grande), a California corporation.

Both Circle City and Arroyo Grande owned hospitals and other assets. The asset purchase agreements covered both the hospitals as well as other assets including parcels of raw land that were adjacent to the hospitals (nonhospital properties). The agreements were assignable to "a section 501(c)(3) organization" and were conditioned upon Alpha Hospital's obtaining financing in an amount and on terms acceptable to Alpha Hospital in its sole discretion.

During the summer and early fall of 1990, Alpha Hospital and AMH worked with Vista Hospital Systems, Inc., a California non-profit organization, to complete the acquisition of the properties by Vista. As we discuss below, such acquisition was to be accomplished by the assignment to Vista of Alpha Hospital's rights under the asset purchase agreements. First Boston Corporation, New York, New York (First Boston), agreed to underwrite the financing of the acquisition, which financing was to be accomplished by the City of Arroyo Grande's issuing Series 1990 A Certificates of Participation and the City of Corona issuing Series 1990 B Certificates of Participation (collectively 1990 certificates). During October 1990, First Boston circulated a Preliminary Official Statement to potential buyers of the 1990 certificates. The principal amount sought during the initial offering was $61.1 million. First Boston was unable to raise that amount.

On October 10, 1990, Alpha Hospital and AMH entered into the First Amendment to the asset purchase agreements. On that same day, Alpha Hospital, and Vista entered into an agreement entitled "Assignment, Assumption and Security Agreement" (assignment agreement). In the assignment agreement, Vista was assigned Alpha Hospital's contract rights to purchase the hospitals that Alpha Hospital had acquired in the asset purchase agreements. The assignment agreement also provided that Alpha Hospital would be retained to manage the day-to-day operation of the hospitals after the acquisition by Vista. AMH, Arroyo Grande, and Circle City consented to the assignment agreement.

Also, on October 10, 1990, Alpha Hospital and AMH entered into an agreement with Great Western Inc. (Great Western), a validly formed, unrelated, corporation that was owned during 1990 by Jill C. Hanna (Ms. Hanna). Under the terms of the October 10, 1990, agreement, Great Western was assigned the contract rights of Alpha Hospital to acquire the nonhospital properties. The October 10, 1990, assignment agreement covering the nonhospital properties failed to set forth a sales price or times for making payments.

On December 14, 1990, because of the difficulties that First Boston encountered in raising the necessary financing, AMH and

Vista[3] entered into the Second Amendment to the asset purchase agreements that reduced the purchase price of the hospitals.

On December 15, 1990, Vista and Alpha Hospital entered into an Amended and Restated Management agreement. Under the terms of the December 15, 1990, agreement, Alpha Hospital would receive $600,000 plus 2 percent of the hospitals' net patient service revenues annually. Additionally, Alpha Hospital was to receive $475,000 for its assignment of its rights under the asset purchase agreements. The management agreement was contingent on the employment of F. Scott Gross at Alpha Hospital. Neither the management agreement nor the assignment agreement made any mention of compensation to be paid to Mr. Rogers.

On January 10, 1991, AMH and Vista executed the Third Amendment to the asset purchase agreements in which the overall size of the tax-exempt financing was lowered from $61.1 million to $51.4 million, including a reduction in the purchase price by AMH from $38.3 million to $30.4 million.

In an agreement dated January 15, 1991, Mr. Rogers assigned to Great Western all rights that he might have in the agreement between Alpha Hospital and AMH with respect to the nonhospital

---

[3] Even though Alpha Hospital was a party to the asset purchase agreements and first amendment to the asset purchase agreements, it was not a signatory party to any subsequent amendments to the asset purchase agreements.

properties.[4]  In return, Great Western agreed to remit to Mr. Rogers 95 percent of all proceeds it received on the sale of such properties.  The January 15, 1991, agreement was contingent on the consummation of the agreements between Vista and AMH and on Great Western's resale of nonhospital properties.  Also, on January 15, 1991, Ms. Hanna, on behalf of Great Western, executed a promissory note requiring Great Western to pay Mr. Rogers 95 percent of the proceeds received on the sale of nonhospital properties.  On his 1991 Federal income tax return, Mr. Rogers reported the January 15, 1991, transaction as an installment sale of contract rights valued at $9,804,000.[5]

On January 23, 1991, the sale of the hospitals from AMH to Vista closed.  On that same day, the nonhospital properties were transferred by Grant Deeds from Arroyo Grande and Circle City to Great Western.  Great Western neither paid any remuneration nor gave anything of value to AMH or its subsidiaries for the nonhospital properties.

On February 1, 1991, Great Western leased to Vista a medical office building located on one of the nonhospital properties for $143,050 in rent, payable in equal semiannual installments of

[4]    The Jan. 15, 1991, agreement refers to properties described in "Exhibit A", but Exhibit A is not part of the record. However, it is clear that "Exhibit A" contained a description of the nonhospital properties.

[5]    See supra note 2.

$71,525.  For 1991, Great Western reported on its income tax return the receipt of rent in the amount of $83,446 from the nonhospital properties.

Between March and July 1991, Ms. Hanna, on behalf of Great Western, attempted to sell the nonhospital properties.  During May 1991, Vista, through Alpha Hospital, offered to purchase the nonhospital properties.  During 1991, Great Western sold the nonhospital properties to Vista.  Vista financed the purchase of the nonhospital properties through tax-exempt Certificates of Participation issued by the Cities of Arroyo Grande and Corona, California, (1991 certificates) to Great Western.  The 1991 certificates were nonrecourse obligations secured only by the property acquired.  The 1991 certificates were zero coupon obligations and no principal or interest payments were to be made until specified dates in the future.  On receipt of the 1991 certificates, Great Western agreed that it would not attempt to transfer or otherwise dispose of the 1991 certificates without receiving from a rating agency a rating of A or better for the 1991 certificates.

During November 1991, Ms. Hanna, on behalf of Great Western, attempted to obtain a rating for the 1991 certificates so that the certificates could be marketed.  To assist in that effort, Great Western retained the underwriting firm of Peacock, Hislop, Staley, and Given, Inc. (Peacock).  The efforts of Peacock

ultimately failed.  In a letter dated March 4, 1992, Peacock ended its representation of Great Western, citing among its reasons the repeated failure of Great Western to provide it with adequate information.

Pursuant to the financing agreement covering its purchase of the nonhospital properties, Vista was required to make annual deposits in a sinking fund that would be used to pay principal and interest on the 1991 certificates when they became due. Vista defaulted on its obligations in 1993 and tendered to Great Western a Deed in Lieu of Foreclosure.  At that time, Great Western discovered that Vista had failed to pay real property taxes on the nonhospital property in Corona, California, and had thereby encumbered the property.  Negotiations between Great Western and Vista were commenced in an attempt to force Vista to cure its default.  Those negotiations failed and, during October 1995, the trustees of the 1991 certificates foreclosed.

On March 15, 1996, Great Western executed agreements with the trustees and the Cities of Arroyo Grande and Corona terminating the 1991 certificates.  On June 24, 1996, and on July 1, 1996, Great Western received a Trustee's Deed Upon Sale for each of the nonhospital properties.  During 1997, Great Western again sold the nonhospital properties.  Most of the purchase price for the 1997 sale covered back taxes and expenses.  Mr.

Rogers, however, received $32,500 from the 1997 sale of the properties.

Discussion

We must first decide whether, during 1991, Mr. Rogers received a compensatory interest in the nonhospital properties as payment for his services in arranging the transaction between AMH and Vista. Because respondent raised this issue for the first time in the amended answer, respondent bears the burden of proof. Rule 142.

Respondent contends that a compensatory interest in the nonhospital properties was transferred to Mr. Rogers during 1991 as payment for his services in arranging the transfer of the hospitals from AMH to Vista. None of the numerous stipulated documents, however, refer to any such payment. Rather, the stipulated documents show that Alpha Hospital received $475,000 for the transfer of its rights to the hospitals and nonhospital properties from AMH. Additionally, Alpha Hospital was awarded lucrative management contracts at both hospitals for which it was to be paid a combined $600,000, plus 2 percent of the net patient service revenues annually. The only documentary evidence of Mr. Rogers' interest in the nonhospital properties is the agreement dated January 15, 1991. In that agreement, Mr. Rogers transferred his interest in the contract between Vista and AMH, with respect to the nonhospital properties, to Great Western in

return for Great Western's promise to sell those properties and remit to Mr. Rogers 95 percent of the proceeds. The character of Mr. Rogers' interest in the nonhospital properties and the point at which Mr. Rogers received that interest are not disclosed in any of the stipulated documents. Because the instant case was submitted on the basis of the stipulation of facts without trial, there is no other evidence concerning Mr. Rogers' interest in the nonhospital properties.

Acknowledging that there is no documentary evidence of a compensation agreement between Mr. Rogers and Alpha Hospital, respondent argues that there was an oral understanding between Mr. Rogers and Alpha Hospital that Mr. Rogers would attempt to sell the hospital properties acquired by Alpha Hospital from AMH in return for the receipt of the nonhospital properties on consummation of the sale. Respondent, however, presented no witnesses to testify to that understanding and presented no other evidence in addition to the stipulations.

As we stated in the introduction to our findings of fact, the record in the instant case is confusing and incomplete. The stipulations of fact fail to explain the significance of the numerous attached exhibits and the details of the transaction which the exhibits purport to describe. The opacity of the record appears to be due in no small part to respondent's failure to articulate a coherent theory of the case until long after all

the evidence had been submitted.  Moreover, as we stated above, respondent has the burden of proof in the instant case.  A decision in favor of respondent, therefore, cannot rest on assumption or speculation but must rest on fact.  Champayne v. Commissioner, 26 T.C. 634, 645 (1956); Wood Corp. v. Commissioner, 22 B.T.A. 1182, 1186 (1931), affd. 63 F.2d 623 (6th Cir. 1933).  That the instant case was submitted to the Court fully stipulated does not relieve respondent of that burden. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 517 (1992).

In sum, respondent has failed to introduce evidence in the instant case sufficient to show the character of the interest Mr. Rogers received in the nonhospital properties.  Even if we were to assume that Mr. Rogers received a valuable[6] interest in such properties, respondent introduced no evidence to show that Mr. Rogers received that interest during 1991.  Accordingly, based on the woefully inadequate record before us, we hold that respondent has failed to carry the burden of proof in the instant case.

Because we have found that respondent has failed to prove that Mr. Rogers received a compensatory interest in the nonhospital properties during 1991, we hold that petitioners are not liable for the penalty pursuant to section 6662(a) for

---

[6]    Because we hold for petitioner, the issue regarding the value of Mr. Rogers' interest in the contract rights is moot.

substantial understatement.  We have considered respondent's remaining arguments and find them irrelevant or unnecessary to reach.[7]

To reflect the foregoing,

<u>Decision will be entered for petitioners</u>.

---

[7]    Respondent has, on brief, advanced the argument that Great Western is a sham corporation controlled by Mr. Rogers through his attorney John Konvalinka, who is the brother-in-law of Ms. Hanna.  We note that on the day this case was called for trial, before the parties agreed to submit the case as fully stipulated, respondent attempted to assert this theory.  Upon petitioner's objection and the Court's inquiry, respondent specifically disavowed any such theory regarding the transaction in issue in the instant case.  Respondent has offered no reason why the Court should consider such an argument.

Moreover, respondent's protestations of sham are not supported by the evidence in the record.  The parties have stipulated that Great Western was a validly formed corporation owned by Ms. Hanna.  Additionally, there is extensive correspondence between Ms. Hanna and various third parties that evidence Ms. Hanna's active participation in the management and sale of the nonhospital properties.  Accordingly, even if we were to consider respondent's sham-transaction theory, we would hold that respondent has failed to carry the burden of proof on that issue as well.